**James BAKER, Appellant (Respondent Below),**

v.

**Imogene WAGERS, Appellee (Petitioner Below).**

No. 2–883–A–290.

Court of Appeals of Indiana, Second District.

Dec. 27, 1984.

Rehearing Denied Jan. 22, 1985.

R. Victor Stivers & Associates, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Judge.

Following a trial to the court in a paternity action, James Baker was found to be the father of Imogene Wagers' only child. Baker appeals. We affirm.

The sole issue Baker presents is whether the trial court erred in allowing into evidence the results of red blood cell antigen and enzyme tests. Baker argues that because the technician who conducted the tests was not present at trial, the test report constituted inadmissible hearsay. Additionally Baker contends that the business record exception to the hearsay rule does not apply because the tests were not properly identified by the custodian of the records and because the report was prepared specifically for litigation. We emphasize that Baker does not contest the accuracy of the red blood cell antigen tests, the test's reputation for reliability in the relevant scientific community, or the use of these tests to establish, rather than to negate paternity.[1]

Before trial and pursuant to a court order authorized under I.C. 31–6–6.1–8 and Indiana Rules of Procedure, Trial Rule 35(A), Baker, Wagers and the child submitted to a battery of fifteen red cell antigen and enzyme tests performed at the Riley Children's Hospital in Indianapolis, Indiana. At trial Wagers called as an expert witness Dr. P. Michael Conneally, a professor of medical genetics and neurology at the Indiana University Medical Center and the supervisor of paternity testing at Riley's Children's Hospital.

Dr. Conneally testified as to his credentials in the area of medical genetics and paternity testing, explained the scientific theory behind the red cell antigen and en-

---

1. Indiana Code 31–6–6.1–8 (Burns Code Ed. Supp.1984) which originally provided for admission of these test results only in cases where total exclusion of paternity was established, [IC 34–3–3–1 (Burns Code Ed.1976) ], was amended in 1979 to allow for use of the tests to prove paternity, as well as to exclude it. The amendment apparently reflects the legislative judgment that the scientific reliability of these tests has improved dramatically since the provision was originally adopted in 1953. *See* Garfield, *Survey of Recent Developments in Indiana Law-Domestic Relations,* 14 Ind.L.Rev. 315, 358 (1981). *See also* Protogere, *Use of Human Leukocyte Antigen Test Results to Establish Paternity* 14 Ind.L.Rev. 831 (1981); Krause, *Scientific Evidence and the Ascertainment of Paternity,* 5 Fam.L.Q. 252 (1971); Abbott, Sell & Krause *Joint AMA–ABA Guideline's Present Status of Serologic Testing in Problems of Disputed Parentage,* 10 Fam.L.Q. 247 (1976).

While the statute may provide a legislative determination that these tests satisfy the familiar *Frye* test for admission of scientific tests (generally accepted as reliable in the relevant scientific community), a proper foundation for the specific test in question must still be established before these results are admissible into evidence. *In Re Paternity of Gregory* (1st Dist. 1984) Ind.App. 469 N.E.2d 480.

zyme tests, and attested to the general testing procedures utilized at his research lab. Dr. Conneally further testified that the fifteen separate tests were performed by Mary Jane Barnhart, a technician under his supervision, although he was not immediately present when the tests were conducted. Dr. Conneally explained that Ms. Barnhart's job was basically one of data collection, of identifying whether or not there is glutination or clumping of the cells, and then recording that finding. Once the technician gathers the data, Dr. Conneally interprets it and either excludes the man as the father or arrives at an arithmetical probability of paternity. Over Baker's hearsay objection, the test report was admitted into evidence. It consisted of the results of each of the fifteen tests and an interpretive paragraph written by Dr. Conneally stating that there was 97.77 probability that Baker, rather than any other man who might be randomly selected, was the father.

 We must first determine whether the report constituted hearsay. A classic definition of hearsay is:

> "Hearsay evidence is testimony in court or written evidence, of a statement made out of court, such statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter." McCormick on Evidence (2d Ed.1972) p. 584.

Applying this definition to the contested exhibit, it is clear that Barnhart's notations as to results of the fifteen separate tests are hearsay. This report contained written evidence made out of court and offered in court to show the truth of the matter asserted, i.e., that the blood of Wagers, Baker and the child possessed certain characteristics.[2]

To simply state that these results are hearsay does not end our inquiry. Many exceptions have been carved out of the hearsay rule based upon the unavailability of the declarant and/or the reliability of the declaration, and/or the presumed inefficacy of any possible cross-examination. *See generally* 5 Wigmore, Evidence §§ 1420–1427 (Chadbourn Rev.1974); McCormick on Evidence § 253 (3d Ed.1984); Seidman, *The Law of Evidence in Indiana,* p. 115 (1977). The admissibility of "regularly kept" or "business" records without the testimony of the declarant is one such exception.

The business record exception to the hearsay rule is an outgrowth and expansion of the old English common law "shop book rule," pursuant to which the books of accounts of businesses were admissible without the testimony of the person who made the entries. Trustworthiness and necessity were the parents of this exception. Reliability was found in the regularity and continuity of the record-keeping process; necessity was established first because the shopkeeper, usually a party in interest, was disqualified under English common law from testifying in his or her own behalf, and secondly, if it was a clerk who made the entry, he or she could either not be located at time of trial, or, if found, would not remember the particular transaction. The law also recognized that in actual experience, the commercial world functioned daily in reliance upon records of these types. After an early judicial development of this exception forty-three American jur-

---

**2.** Under Indiana law it is also clear that because Dr. Conneally was on the witness stand, the interpretive paragraph written by him and contained in the report was not inadmissible hearsay. *See Patterson v. State* (1975) 263 Ind. 55, 324 N.E.2d 482; *but see Samuels v. State* (1978) 267 Ind. 676, 372 N.E.2d 1186 (*Patterson* should not be abused by substituting out-of-court statements for available in-court testimony).

Because the document contained both hearsay and non-hearsay, it was Baker's burden to identify the hearsay portion and make a specific objection and motion to delete that portion. If the opponent of evidence thought to be objectionable does not follow this specific procedure, the trial court does not err by overruling the objection. *Gayer v. State* (1965) 247 Ind. 113, 210 N.E.2d 852, *reh. denied* 247 Ind. 113, 123, 212 N.E.2d 544. However, because neither party nor the trial court raised this point, and because of the confusion regarding whether *Patterson* means the statement is not hearsay or is hearsay which is admissible, we do not rest our determination upon a waiver theory.

isdictions adopted statutes or court rules governing the admission of regularly kept records.[3] Indiana has no such codified provision.

This court summarized the various Indiana cases defining the business record exception in *American United Life Ins. Co. v. Peffley* (2d Dist.1973) 158 Ind.App. 29, 36–37, 301 N.E.2d 651, 656, *reh. denied* 158 Ind.App. 29, 306 N.E.2d 131, and outlined the requisites for admissibility.

"A synthesis of the Indiana cases treating what modern authorities call the 'business record' exception to the hearsay rule is that documentary evidence is admissible if identified by its entrant or one under whose supervision it is kept and shown to be an original or first permanent entry, made in the routine course of business, at or near the time of the recorded transaction, by one having both a duty to so record and personal knowledge of the transaction represented by the entry. *Herman v. State,* (1965) 247 Ind. 7, 210 N.E.2d 249, *cert. denied,* 384 U.S. 918, 86 S.Ct. 1364, 16 L.Ed.2d 439; *Polus v. Conner,* (1931) 92 Ind.App. 465, 176 N.E. 234; *J.P. Smith Shoe Co. v. Curme-Feltman Shoe Co.,* (1918) 71 Ind. App. 401, 118 N.E. 360; *Marks v. Box,* (1913) 54 Ind.App. 487, 103 N.E. 27; *Indianapolis Outfitting Co. v. Cheyne Electric Co.,* (1913) 52 Ind.App. 153, 100 N.E. 468."

Baker first argues that Dr. Conneally was not a proper person to identify the document because there was no showing that he was the "appropriate custodian of records." To support his position Baker relies on the oft-repeated statement in *Peffley* that the document must be "identified by its entrant or one under whose supervision it is kept …." *Supra,* 301 N.E.2d at 656. Our language in *Peffley* may be susceptible to misinterpretation and is deserving of clarification or modification.

A review of the five cases upon which we relied in *Peffley* for the above proposition reveals that none actually involved a

"records supervisor" or "records custodian." Three of the cases, *Herman, Polus,* and *Indianapolis Outfitting Co., supra,* all involved a testifying entrant. The remaining two cases, *J.P. Smith Shoe Co.* and *Marks, supra,* involved the supervisors *of* the entrants, not necessarily the supervisors of the record-keeping departments of the businesses.

█ While the most commonly encountered witness today may be a person in authority of the record-keeping department of the business, he or she is not the only witness who can provide the necessary foundation for admission of a business record. This foundation can be established by *anyone* who possesses, with respect to the particular document in question, the knowledge of the criteria enumerated in *Peffley, supra,* 301 N.E.2d at 656. This could be the entrant, the entrant's supervisor, co-workers, a records custodian or any other such person. What we demand is not a witness with a formalistic title but one with a functional understanding of the record-keeping process of the business with respect to the specific entry, transaction or declaration contained in the document. This clarification or modification of *Peffley* is consistent with the outcome reached in other Indiana cases, *see Thompson v. State* (1979) 270 Ind. 442, 386 N.E.2d 682 (entrant's supervisor), *Jones v. State* (1977) 267 Ind. 205, 369 N.E.2d 418, (assistant administrator), *rev. on other grounds, Elmore v. State* (1978) 269 Ind. 532, 382 N.E.2d 893, as well as with Rule 803(6) of the Federal Rules of Evidence (foundational witness may be "custodian or other qualified witness") *see American International Pictures, Inc. v. Price Enterprises, Inc.* (4th Cir.1980) 636 F.2d 933, *cert. denied* 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863 (officers of business), *see also* McCormick (3d Ed.) *supra,* pp. 881–887.

█ Dr. Conneally, as supervisor of paternity testing, was eminently qualified to authenticate the challenged document. He

---

**3.** Most state business record exceptions closely track Rule 803(6) of the Federal Rules of Evidence. *See* David F. Binder, *Hearsay Handbook,* pp. 142–144 (2d Ed., 1983).

testified that the regular business of his lab was to conduct such tests and that these particular tests were performed and recorded by Ms. Barnhart, a technician working under his supervision. Ms. Barnhart obviously had personal knowledge of the test results since she performed the tests and recorded the outcomes. The trial court did not err.

■ Lastly, Baker contends that the report was not a business record at all because it was prepared specifically for litigation. Dr. Conneally testified that the regular business of his lab was to prepare such reports and that this report was prepared pursuant to a court order specifically for this litigation. Thus it is a business record which was prepared specifically for litigation.

Baker cites *Bradley v. Phelps* (1970) 147 Ind.App. 349, 260 N.E.2d 894, for the proposition that a report prepared in anticipation of litigation does not qualify under the business record exception to the hearsay rule. At first blush his argument appears convincing. However, *Bradley* is clearly distinguishable upon both the facts and the underlying analysis. The plaintiff in *Bradley*, a heating contractor, testified that he prepared the offered document, an itemized invoice for the sale and installation of a furnace, not as part of the business transaction but solely for its use in his breach of contract suit. This court held that it was error, albeit harmless under the circumstances, for the trial court to admit the document.

The reasoning in *Bradley* closely paralleled that used in *Palmer v. Hoffman* (1943) 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, the case in which the U.S. Supreme Court originally disqualified documents prepared specifically for litigation from the purview of the business record exception to the hearsay rule. *Palmer* was a suit against a railroad arising out of an accident at a railroad crossing. A few days after the accident railroad agents, acting pursuant to established company policy, obtained a statement from the engineer. Prior to trial the engineer died and at trial the railroad attempted to introduce his statement by showing that the railroad obtained such statements in the regular course of its business. The court held the record was properly excludable.

In both *Bradley* and *Palmer* the offered documents were prepared by a party to pending or probable litigation who had both a motive and an opportunity to frame the record and its contents in self-serving terms. Thus these documents lacked the requisite indicia of trustworthiness attributed to business records and were wisely excluded. The instant case is quite different. Here the tests were conducted by a non-party in the normal course of business. The lab was not an agent of any of the parties and had no reason or motive to prefer one outcome over the other. The traditional attributes of trustworthiness associated with business documents were not shorn from these test results by virtue of their being conducted pursuant to a court order, and their admissibility should not be impaired by an exception to an exception moulded to counter dangers not herein present. The report was properly admitted into evidence.

■ The judgment of the trial court is affirmed.[4]

BUCHANAN, C.J., and SHIELDS, J., concur.

---

**4.** We note an additional ground for affirmance. Because Dr. Conneally was qualified as an expert he could state his opinion based upon tests not performed by him but by technicians under his direction. *Indianapolis Union Railway v. Walker* (1st Dist.1974) 162 Ind.App. 166, 318 N.E.2d 578. In *Duncan v. George Moser Leather Co.* (2d Dist.1980) Ind.App., 408 N.E.2d 1332, we elaborated upon the *Walker* decision and established a three-prong test for admissibility of an expert opinion based upon material either not in evidence or inadmissible as substantive evidence because of the hearsay rule. First the expert must have sufficient expertise to evaluate the reliability and accuracy of the report, secondly the report must be of a type normally found reliable, and, lastly, the report must be of a type customarily relied upon by the expert in the practice of his profession or expertise. *Duncan, supra* at 1343.

Assuming arguendo that the actual test results were inadmissible hearsay, it is still clear that Dr. Conneally's testimony satisfied the *Duncan* test. Any error in admitting the actual test results, which the average lay person could not begin to interpret, was thus harmless because it was Dr. Conneally's opinion of 97.77 probability of parentage, properly admitted, which was prejudicial to Baker's position.