**Frank HOPKINS, a/k/a Frank Ali Abdul–Rahman, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 02S00–8905–CR–426.**

Supreme Court of Indiana.

Oct. 21, 1991.

As Corrected Nov. 1, 1991.

Charles F. Leonard, Deputy Public Defender, Fort Wayne, for appellant.

Linley E. Pearson, Atty. Gen., Gary Damon Secrest, Deputy Atty. Gen., Indianapolis, Stephen Sims, Pros. Atty. of Allen County, Fort Wayne, for appellee.

GIVAN, Justice.

A jury trial resulted in appellant's conviction of murder and felony murder. The trial court correctly determined that the two convictions merged and sentenced appellant upon the felony-murder count to sixty (60) years in prison and imposed a $10,000 fine.

The facts are: The victim, Sharon Lapp, was acquainted with appellant, an aerobics instructor at the Old Fort Y.M.C.A. He had visited in the Lapp home. When Tom Lapp, the victim's husband, returned home from work at approximately 5:15 p.m. on May 1, 1985, he found the garage gate and the back door to the house both unlocked, which was unusual. Receiving no response upon entering the house, he proceeded upstairs, finding the den in disarray and the contents of his wife's purse dumped on the floor. He then went into their bedroom and found her nude body in a kneeling position over their bed, her throat cut nearly to the point of decapitation. An autopsy revealed Mrs. Lapp had suffered six additional stab wounds to her back and one to her left side, all delivered with "severe force" subsequent to the throat-slashing, which had been fatal.

A couple of weeks prior to the homicide, appellant and a friend had worked a tree-trimming job a block and a half from the victim's home. Appellant was identified as having solicited a drink of water from a neighbor of the Lapps on the day before the murder. Around 1:15 on the afternoon of the crime, appellant approached a man outside the home of a neighbor of the Lapps and offered to do some yardwork; the man soon thereafter jotted down a detailed description of appellant, which was introduced at trial along with that witness's testimony. Another witness placed appellant at an intersection near the Lapp home at 4:07 p.m. Bernard Williams, appellant's acquaintance since 1979, testified appellant arrived at his home around 4 p.m. that day looking scratched, nervous and disheveled, and remarked, "Goddamn, nothing went right. I f——ed up. That bitch. I think they saw me. I got to get out of town. Do you have a gun? Can you take me out of town?" Williams declined to assist appellant.

With the aid of other friends, appellant made his way first to Goshen, Indiana, then to East Chicago, where he wrote a letter to

his wife stating, *inter alia*, "I'm sorry the marriage had to end this way ... I'll die first before I let a white man chain me up, and I'm headed for California." Appellant left behind a sheath knife capable of inflicting the victim's stab wounds when he moved from East Chicago, ultimately to the State of Oregon. Subsequent DNA analysis found a genetic match between semen collected from the victim's genitalia and whole blood samples taken from appellant, thereby establishing him as the source of that semen.

Appellant contends the trial court erred in denying his motion to dismiss and/or suppress based on the State's alleged intentional or negligent destruction of potentially exculpatory evidence. Mrs. Lapp was a prominent civic activist who had gathered information concerning activities of local authorities. On the day following the murder, Fort Wayne Deputy Chief of Police Ronald Hathaway was sent by his superiors to the victim's home where, contrary to established department protocol, he entered the victim's study, an area theretofore unprocessed by evidence technicians, and removed potentially sensitive files. These files dealt with the victim's research into, *inter alia*, cocaine use within the upper echelons of the local administration. Deputy Chief Hathaway delivered them to the Chief of Police and the Public Safety Director for their inspection. The files eventually were turned over to Indiana State Police investigators, but the victim's "cocaine file," known to have been kept on her person at all times, and the one on the Chief of Police himself were never recovered. In addition, the other items of physical evidence found in the home were negligently maintained and/or left unanalyzed such that appellant maintains he was materially prejudiced by the State's failure to properly process the potentially exculpatory evidence.

Appellant argues the trial court's denial of his motions to suppress/dismiss based upon this allegedly negligent destruction of exculpatory evidence violated his Fourteenth Amendment rights to fundamental fairness and due process of law. He notes that at the hearing on his motion, the trial court found the deputy chief had collected the items "for three generalized purposes: a. Police command suspected involvement of a member of the Department; b. The items compromised the administration; and, c. Items were evidence of a crime." The court ruled the destruction of potentially exculpatory evidence by the police constituted "malfeasance, misfeasance and nonfeasance" and had affected appellant's ability "to seize an unknown opportunity to use the lost evidence or to demonstrate prejudice for its non-production. The Defendant has met his burden of demonstrating materiality." The court then ruled *in limine* that items of physical evidence seized by police from the Lapp residence were inadmissible due to lack of continuity in the chain of custody and improper preservation. However, the court went on to find it would not grant the motion to dismiss the charges because a trial court should not dismiss the charges absent a showing that the lost evidence would have provided a viable defense, citing *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413.

Appellant urges this Court to find the trial court applied an erroneous standard and otherwise to hold, despite the more recent decision in *Arizona v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281, that a dismissal of the charges was warranted even absent a showing of bad faith on the part of the police. In any event, however, more is required for reversal than a showing of the bad-faith loss of potentially material exculpatory evidence. As pointed out in Justice Stevens' concurring-in-result opinion in *Youngblood*, the potential of the evidence to exculpate the accused "must be evaluated in the context of the entire record," because the "proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt," citing *United States v. Agurs* (1976), 427 U.S. 97, 112, 96 S.Ct. 2392, 2401–2, 49 L.Ed.2d 342, 354–5. He also notes that where the other evidence of guilt at trial is so overwhelming that the likelihood of exculpation becomes highly improbable, no due process

violation results from the loss of the evidence, citing *Trombetta, supra.*

■ Here, where the DNA matching evidence identified appellant as the perpetrator, and the other circumstantial evidence outlined in the preceding paragraphs all pointed to appellant, the likelihood of his being exculpated by proper preservation of the evidence in question seems remote indeed. This situation is somewhat analogous to the one in *Lee v. State* (1989), Ind., 545 N.E.2d 1085, where this Court found no reversible error despite the purposeful destruction of audiotape of an interrogation of the accused due to its inclusion of unseemly remarks perceived as embarrassing to the police department. In that case, as in this one, a showing of arguably bad-faith destruction, absent some material likelihood of exculpation, did not result in a denial of due process.

We find no error in the trial court's denial of appellant's motion to dismiss.

Appellant contends the trial court erred in admitting evidence identifying him as the perpetrator by means of biologically matching his blood with semen found in the victim. Prior to trial, appellant was informed by the prosecution that tests run by Cellmark Laboratory indicated a match with the genetic coding material (*d*eoxyri-bo*n*ucleic *a*cid, or DNA) derived from blood samples drawn from appellant in a comparison with DNA extracted from traces of semen found on vaginal swabbings taken from the victim. Appellant then filed a motion in limine to exclude the evidence of DNA identification.

Recognizing the issue to be one of first impression in Indiana involving the admissibility of novel scientific evidence, the trial court, observing our decision in *Cornett v. State* (1983), Ind., 450 N.E.2d 498, conducted a *Frye* hearing, so named after *Frye v. United States* (D.C.Cir.1923), 293 F. 1013, which decision set forth the inquiry still generally followed in assessing the reliability of novel scientific evidence, to determine whether such DNA evidence is generally accepted by the relevant scientific community. The hearing, conducted November 9 through December 20, 1988, generated nearly 2200 pages of transcript as well as several dozen videocassettes, played back at the trial in order to place that expert testimony before the jury. When the *Frye* hearing concluded, the trial court denied appellant's motion to exclude and at trial admitted, over appellant's objection, the State's expert evidence regarding its forensic DNA test results.

Appellant argues the State failed to lay a proper foundation under *Frye, supra* and *Cornett, supra* for the DNA evidence because it is not yet generally accepted in the relevant scientific communities, because the particular procedures used by Cellmark were not validated and did not meet applicable standards of reliability, and because in his particular instance Cellmark did not even follow their own protocol, leaving open an unacceptably high possibility of a "false positive" match. In *Frye, supra,* the District of Columbia Court of Appeals, in excluding evidence of fluctuations in systolic blood pressure readings as an index of deception (*i.e.*, a "monograph" lie detector test), held that:

> "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.* at 1014.

In *Cornett, supra* at 503, "after reviewing testimony in the record, opinions of different jurisdictions, and articles from law reviews and scientific journals," this Court found in concluding an in-depth analysis "that voice spectrography [had] not gained general acceptance in the scientific community," and went on to observe that:

> "The trial court and jury should not, on a case by case basis, be called upon to resolve a conflict in the scientific commu-

nity concerning the validity of a new scientific process. If the experts themselves cannot agree about the reliability of a scientific technique, the courts should restrain its introduction because of potential harm and prejudice to the parties involved." *Id.* at 503.

The State responds to appellant's initial assertion by arguing that DNA identification evidence "is being admitted by virtually every court in which it is offered, at both the trial and appellate level." As noted in *Caldwell v. State* (1990), 260 Ga. 278, 393 S.E.2d 436, while DNA analysis has been a standard technique in research laboratories for years, its forensic use is of quite recent origin. As put by a New York state opinion ruling on the most voluminous DNA evidentiary hearing to that date, "[a]ll of the procedures have gained general scientific acceptance [citations to numerous scientific articles omitted]. It is the transfer of this technology to DNA forensic identification that has generated much of the dispute." *People v. Castro* (1989), 144 Misc.2d 956, 545 N.Y.S.2d 985, 990. For example, in *Commonwealth v. Curnin* (1991), 409 Mass. 218, 565 N.E.2d 440, the Massachusetts Supreme Court held that Cellmark's procedure for calculating the astronomically high probability of that particular DNA match occurring randomly was supported by no demonstrated general acceptance or inherent rationality and their results thus were inadmissible.

In *Castro, supra* the court settled upon a three-prong analysis in its *Frye* evaluation, to wit:

"*Prong I.* Is there a theory, which is generally accepted in the scientific community, which supports the conclusion that DNA forensic testing can produce reliable results?

*Prong II.* Are there techniques or experiments that currently exist that are capable of producing reliable results in DNA identification and which are generally accepted in the scientific community?

*Prong III.* Did the testing laboratory perform the accepted scientific tech-

niques in analyzing the forensic samples in this particular case?" *Id.* at 987.

Observing that some courts had considered all three prongs as matters of law under the *Frye* standard, while others had indicated that the third prong belonged in the realm of the trier of fact and thus went to the weight of the evidence rather than its admissibility, the *Castro* court went on to note that "by focusing attention on the general acceptance issue, the test obscures critical problems in the use of a particular technique.... [I]n this complex area of DNA identification[, t]he focus of this controversy must be shifted. It must be centered around the resolution of the third prong." *Id.* at 987.

In accord with *Castro* in this respect are both *Caldwell* and *Curnin, supra,* holding that any question as to proper implementation of accepted testing procedures should be resolved by the court as a threshold question before the jury is given the opportunity to determine the soundness of the process "because evidence of this character has too great a potential for affecting a jury's judgment." *Id.* 565 N.E.2d at 443, n. 7, citing *United States v. Two Bulls* (8th Cir.1990), 918 F.2d 56.

■ We are sympathetic to this reasoning but find more is involved in resolving this issue. Under the guidance of our opinion in *Cornett, supra,* in view of the plethora of supporting evidence in the instant record, and relying upon the aggregate strength of case law from other jurisdictions cited above, we resolve the first two prongs in favor of holding that the theory and techniques of DNA identification currently available are generally accepted in the scientific community as capable of producing reliable results.

This resolution as to prongs I and II is in accord with recent Indiana legislation passed after this case was tried and thus cited here for information only. Indiana Code § 35–37–4–10, introduced as Senate Bill No. 283 and enacted as Public Law 37–1990, SEC. 24, defines "forensic DNA analysis" and goes on to provide:

"(b) In a criminal trial or hearing, the results of forensic DNA analysis are ad-

missible in evidence without antecedent expert testimony that forensic DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material."

(This section was repealed by Public Law 1–1991, SEC. 192, but then added in its entirety by SEC. 194 as a new section, denominated § 35–37–4–13.)

As to the third prong, appellant raises several contentions as instances of the State's failure to lay a proper foundation for admission of the DNA matching evidence. They include: Cellmark's failure to publish for peer review purposes their standard analytical procedure, or "protocol," their chemical probes used to mark the areas of variation on the DNA, and their standard of error in measurement of results and in proficiency testing of their lab technicians. Appellant emphasizes these concerns prompted the court in *State v. Schwartz* (1989), Minn., 447 N.W.2d 422 to determine Cellmark's results were inadmissible in that case, where much of the same foundational testimony as heard in this case had been presented. He additionally claims Cellmark failed to follow their own established protocols in the course of his particular test, alleging numerous technical deviations from the standard procedure used by Cellmark in their type of DNA matching termed "RFLP (Restriction Fragment Length Polymorphism) analysis."

While we appreciate the logic behind the *Schwartz* court's extensive analysis, we hesitate to adopt their approach essentially of reviewing *de novo* the reliability of particular results. Our adoption of such an approach to the review of the admissibility of DNA evidence, we fear, ultimately would lead to an inconsistency in results and would invade the province of the finder of fact. *See People v. Wesley* (1988), 140 Misc.2d 306, 533 N.Y.S.2d 643, 650.

◼ It is the general rule in Indiana that the proponent of scientific test results bears the burden in each case to lay an evidentiary foundation establishing the reliability of the procedure used in that test. *Smith v. State* (1986), Ind.App., 502 N.E.2d 122 (pertaining to radar speed measure-

ment devices). Even where a legislative determination has obviated the need for a *Frye* determination, "a proper foundation for the specific test in question must still be established before these results are admissible into evidence." *Baker v. Wagers* (1984), Ind.App., 472 N.E.2d 218, 219 n. 1 (pertaining to red blood cell antigen testing to determine paternity).

◼ It seems that the more technical the test involved, the less particularized as a matter of law are the foundational requirements. By way of illustration, in the instance of breath testing for blood alcohol, there are many police officers certified to perform breath testing, yet they each must adhere strictly to the procedural checklist formally adopted to ensure validity of the test results. Ind.Code § 9–11–4–5(d)(4); *Hatch v. State* (1989), Ind.App., 547 N.E.2d 276. In contrast, the foundation for admission of laboratory blood drawing and testing results, by statute, involves technical adherence to a physician's directions or to a protocol prepared by a physician. Ind.Code § 9–11–4–6. It thus would appear that the greater the level of expertise involved, the more that procedural particulars are left to the expert's discretion. *See Hayes v. State* (1987), Ind.App., 514 N.E.2d 332 (expertise of witness is more foundational than particulars of test procedures used).

◼ As of the briefing of this appeal, only three laboratories in the United States conducted commercial forensic DNA testing. Given the abstruse, intensely technical nature of the procedural standards involved, we decline to scrutinize their foundational sufficiency. We therefore hold that once the trial court has ruled the witness qualified as a matter of law to give expert testimony regarding DNA analysis, subsequent evaluation of that evidence goes only to its weight as a matter of fact. Any battle of qualified experts, as in the instant case, or other conflict as to the reliability of evidence is to be resolved by the trier of fact, *see Orr v. State* (1984), Ind.App., 472 N.E.2d 627, whose finding in this regard will be upheld on review as long as the favorable evidence adequately supports it, as with any sufficiency ques-

tion. *See Peters v. State* (1989), Ind., 542 N.E.2d 1340.

■ In the case at bar, the State introduced expert evidence not only laying a proper foundation for the admission of Cellmark's results but also effectively rebutting appellant's contentions questioning the reliability of Cellmark's procedures used in his case. Testimony was heard to the effect that publication of Cellmark's protocols, probes, and test data was not something that normally would be done nor was it necessary, because their procedures were not only generally accepted but were standard throughout the relevant scientific community. Evidence also was adduced to demonstrate that the variations from Cellmark's protocol occurring during testing of the samples in the instant case had no effect upon the validity or reliability of the results. Indeed, the State introduced testimony from at least two qualified independent experts, medical geneticists Professor Michael Conneally of the Indiana University Medical Center in Indianapolis and Professor Bonnie Blomberg of the University of Miami, each of whom found no error in Cellmark's procedures employed here. We note that in addition, Cellmark's results were duplicated and verified using samples sent by them to another laboratory, Lifecodes.

■ Clearly, the trial court was justified in finding the State's experts qualified. The evidence was sufficient to support a factual finding that the DNA testing had been reliably performed in the case at bar according to generally accepted techniques, thus satisfying the third prong of the *Frye* standard. The trial court did not err in admitting evidence of forensic DNA test results identifying appellant as the source of semen found in the victim.

■ Appellant contends the evidence of DNA test results was admitted erroneously due to defects in the chain of custody of the test samples. Semen samples taken during the autopsy of Mrs. Lapp's remains were sealed into a Sirchie Sex Crime Kit which was maintained in a refrigerator at the Fort Wayne Police Department Laboratory during May and June of 1985 prior

to being turned over to Indiana State Police. The kit was sent to Cellmark for analysis some three years later, after appellant's apprehension and indictment.

Citing *Baker v. State* (1983), Ind., 449 N.E.2d 1085 for the proposition that the State must show an unbroken chain of custody from the taking of a specimen through the time it was tested, and *Spranger v. State* (1986), Ind., 498 N.E.2d 931, *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536, for the proposition that the proponent must show the evidence has not been materially altered or tampered with, appellant points out that testimony indicated unauthorized persons had access to the area where the kit was stored, as one door into the lab area was left unlocked during the day. He also argues DNA is a fungible item due to its tendency to degrade, or break down, over time, and the three-year storage period prior to testing thus rendered the results unreliable.

■ However, given the nature and purpose of the testing involved with the sample in question, appellant's argument must fail. The only way he could have been prejudiced by a faulty chain of custody would be if someone had tampered with the kit by placing within it semen containing appellant's own DNA, so as to result in a false positive match; any other custody defect, including physical deterioration of the sample, would result in a failure to match his DNA with that of the autopsy sample, which failure hardly would accrue to his detriment. Further, in light of the lab storage area custodian's testimony that both doors in fact were locked whenever the room was unattended, the possibility of such tampering seems to us too remote to demonstrate any prejudice to appellant. Moreover, the proponent is not required to exclude all possibility of tampering, but need only provide a reasonable assurance that the evidence remained in an undisturbed condition. *Minnick v. State* (1989), Ind., 544 N.E.2d 471. We find no defects in the chain of custody.

■ Appellant contends the evidence was insufficient to support his felony mur-

der conviction. Citing *Hughes v. State* (1989), Ind., 546 N.E.2d 1203, he maintains that even assuming the admissibility of the DNA matching evidence, and therefore that he had sex with the victim, there was no evidence to show he committed the murder. He cites testimony placing the victim alive and speaking on the telephone at 3:30 along with evidence placing appellant 18 blocks away from the Lapp home at 4:00, and concludes there simply was not time for appellant to have struggled with and murdered Mrs. Lapp, sometime after 3:30, before making the 13 to 23 minute walk to the Williams home by 4:00. He also disputes the probative value of other circumstantial evidence, including discrepancies in other witnesses' descriptions and times of sighting him in the vicinity of the Lapp home. He argues the knife introduced in evidence was connected to him but not to the murder, and that his leaving town on the evening of the murder does not lead to a logical inference he murdered Mrs. Lapp.

 However, as stated in *Hughes, supra,* this Court will not reweigh the evidence nor judge the credibility of the witnesses; such is the function of the jury. A guilty verdict may be based solely upon circumstantial evidence and the reasonable inferences to be drawn therefrom. *Id.* The facts before the jury here were ample to support a finding of guilt. We will not second-guess their judgment. *See Johnson v. State* (1989), Ind., 543 N.E.2d 358.

The evidence is sufficient to support appellant's conviction of felony murder.

Appellant contends the trial court erred in failing to set aside his conviction due to juror inattentiveness. When appellant was allowed to personally address the trial court at his sentencing hearing, he advised the judge that certain members of the jury had slept through portions of the *Frye* hearing videotapes when they were replayed at trial. He cites *Smith v. State* (1982), Ind., 432 N.E.2d 1363, wherein we held the trial court's corrective measures taken to alleviate juror inattentiveness obviated any need for a mistrial. Appellant reasons accordingly that because the jury was not recalled to ascertain the degree of their prior inattentiveness, the resulting prejudice calls for a reversal and retrial.

 We disagree. In the first place, appellant's assertions of juror inattentiveness are supported by nothing but his own unsubstantiated, after-the-fact assertions, and no prejudice is demonstrated thereby. In the second place, appellant's failure to call the matter to the court's attention at a time when corrective measures could have been implemented operates as a waiver of the alleged error. *Whiting v. State* (1987), Ind., 516 N.E.2d 1067. We find no error here.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER and KRAHULIK, JJ., concur.

DICKSON, J., concurs with separate opinion in which KRAHULIK, J., concurs.

DICKSON, Justice, concurring.

It is not surprising that the majority opinion appears to presume that Indiana follows the general acceptance test for admissibility of novel scientific evidence established in *Frye v. United States* (D.C.Cir. 1923), 293 F. 1013. In their briefs to this Court, the appellant assumes the applicability of *Frye,* and the State notes that the *Frye* test has been widely criticized, but argues that the DNA evidence satisfied not only a general relevancy standard under the Federal Rules of Evidence, but also the more stringent *Frye* test.

However, the *Frye* general acceptance test has *not* been conclusively adopted as a prerequisite to expert testimony in Indiana. While at least two Indiana cases have chosen to apply the *Frye* reliability analysis: *Peterson v. State* (1983), Ind., 448 N.E.2d 673; *Cornett v. State* (1983), Ind., 450 N.E.2d 498; several others have not. This Court expressly rejected a court-determined reliability factor as a prerequisite to the admissibility of expert opinion in *Boarman v. State* (1987), Ind., 509 N.E.2d 177:

The determination of whether an expert witness is qualified to give an opinion is also within the trial court's discretion. *Rowan v. State* (1982), Ind., 431 N.E.2d

805, 816. Any alleged lack of the evidence's reliability can be brought out on cross-examination. *Id.* As long as the expert is otherwise qualified, the question of reliability goes to the weight of the evidence and not its competency. *Id.*

\* \* \* \* \* \*

We think the jury was in the best position to determine the reliability of the expert's testimony....

509 N.E.2d at 181–82. Rejecting a claim that there was an absence of scientific basis upon which to base an expert opinion, this Court in *Rowan v. State* (1982), Ind., 431 N.E.2d 805, 816, stated:

> The alleged lack of reliability can be brought out on cross-examination, and as long as the expert is otherwise qualified, goes to the weight of the evidence and not to its competency.

In *Fox v. State* (1987), Ind., 506 N.E.2d 1090, we omitted any reference to demonstrated reliability by general scientific acceptance and stated that only two requirements are required for expert opinion testimony.

> First, the subject matter of the expert's opinion must be so distinctly related to some science, profession, business or occupation as to be beyond the knowledge of the average lay-person. Second, the witness must have sufficient skill, knowledge or experience in the field to make it appear that the witness' opinion or inference will aid the trier of fact in the search for truth.

In recent years, courts in at least thirty jurisdictions have limited, avoided, or rejected the *Frye* requirement. *See McCormick on Evidence* § 203, at 607–08 nn. 18–23 (E. Cleary 3d ed. 1984); Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later,* 80 Colum.L.Rev. 1197 (1980). Noting that a "drumbeat of criticism of the *Frye* test provides the background music to the movement away from the general acceptance test," *McCormick* recommends "that the traditional standards of relevancy and the need for expertise—and nothing more—should govern," because:

[i]t avoids the difficult problems of defining how "general" the general acceptance must be, of discerning exactly what it is that must be accepted, and of determining the "particular field" to which the scientific evidence belongs and in which it must be accepted. General scientific acceptance is a proper condition for taking judicial notice of scientific facts, but it is not a suitable criterion for the admissibility of scientific evidence. Any relevant conclusions supported by a qualified expert witness should be received unless there are distinct reasons for exclusion. These reasons are the familiar ones of prejudice or misleading the jury or consuming undue amounts of time.

*McCormick on Evidence, supra,* at 607–08. Consistent with this approach, Fed. R.Evid. 702 requires only that expert testimony "assist the trier of fact," and does not require general scientific acceptance.

There are, however, significant voices expressing renewed interest in a general acceptance test for reliability as a prerequisite for admissibility of expert testimony, and particularly as to novel scientific evidence. *See, e.g., Brock v. Merrell Dow Pharmaceuticals, Inc.* (5th Cir.1989), 884 F.2d 166, 169 (Higginbotham, J., concurring in dissent); R. Cohen, *Unreliable Expert Witness Testimony,* For The Defense, Apr. 1990, at 8; B. Epstein & M. Klein, *The Use and Abuse of Expert Testimony in Product Liability Actions,* 17 Seton Hall L.Rev. 656 (1987); J. Myers, *Expert Testimony in Child Sexual Abuse Litigation,* 68 Neb.L.Rev. 1, 19 (1989).

As to whether a *Frye* reliability test is a necessary ingredient for the admission of expert testimony, the majority opinion itself is equivocal. It accepts for purposes of discussion the appellant's claim that the State failed to lay a proper *Frye* foundation showing general acceptance in the relevant scientific community. However, the majority opinion also appears to require only that the trial court determine whether the expert is qualified as a matter of law to give expert testimony in the subject matter area, without apparent regard for reliability, stating, "any battle of qualified experts,

as in the instant case, or other conflict as to the reliability of evidence is to be resolved by the trier of fact." (Maj. opinion at 1303).

Considering the existing disagreement regarding whether the *Frye* reliability standard should govern admissibility, and the fact that neither of the parties in the present case presents a serious challenge to its acceptance in Indiana, the analysis employed by the majority should not be construed as an endorsement or rejection of the *Frye* methodology. Resolution of this important question remains for another day.

KRAHULIK, J., concurs.