A11A1295. JEFFERSON v. THE STATE.
A11A1296. EDWARDS v. THE STATE.
(720 SE2d 184)

McFADDEN, Judge.

In separate appeals, Tajuan Rashad Jefferson and Omar J. Edwards challenge their convictions for three counts of armed robbery, three counts of aggravated assault, three counts of false imprisonment, and six counts of possession of a firearm in the commission of a crime. They were tried jointly, and we have consolidated their appeals for disposition. Regarding both cases, we find that the evidence was sufficient to support the convictions, and that, although the trial court erred in ruling that the expert testimony of a state's witness satisfied the requirements of *Harper v. State*, 249 Ga. 519 (292 SE2d 389) (1982), the error did not require reversal. Regarding Case No. A11A1295, we find that the trial court did not err in restricting Jefferson's cross-examination of a police officer or in denying his motion to sever his trial. Regarding Case No. A11A1296, we find that testimony from the state's expert witness did not improperly invade the province of the jury, that the court did not err in denying Edwards' motion for mistrial on the ground that an improper comment was made about his exercise of his rights to remain silent and to counsel, and that the court did not err in denying Edwards' motion to suppress the results of a search of his car.

Accordingly, we affirm in both cases.

1. When this court reviews the sufficiency of evidence, "the proper standard for review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979)." *Dean v. State*, 273 Ga. 806, 806-807 (1) (546 SE2d 499) (2001). We review the evidence in the light most favorable to the verdict, giving deference to the jury's determination as to the proper weight and credibility to be given. Id. at 807 (1).

So construed, the evidence shows that the three victims were at the home of one of the victims when three men, two of them later identified as Jefferson and Edwards, forced their way into the home. They bound the victims with duct tape, searched the apartment, and beat one of the victims with a pistol. The men took money, a video game console, and a television and then left.

During the ensuing police investigation, the victim's neighbor

told the police that she noticed an unusual yellow and black Dodge Charger in the neighborhood that day. One of the officers recalled that he had stopped such a vehicle the night before and had arrested Edwards for driving on a suspended license. Although Edwards had been taken to jail, the officer had allowed Jefferson to drive the car away because he had a valid driver's license. A third man had been in the car with Jefferson and Edwards.

As a result of this evidence, the officers secured a search warrant to search Edwards' car and home. None of the stolen items was found, but a roll of duct tape was seized from Edwards' car.

The victims were shown photographic lineups and identified Jefferson and Edwards as two of the men who broke in the apartment and assaulted and robbed them. The victims also identified Jefferson and Edwards at trial. Although Edwards testified in his own behalf denying his participation in the crimes, Jefferson did not.

During the trial, over the objection of both Jefferson and Edwards, the trial court permitted a witness from the Georgia Bureau of Investigation's crime lab to testify as an expert in fracture match analysis. The witness testified that one of the pieces of duct tape found at the scene was torn from the roll of duct tape found in Edwards' car.

This evidence was sufficient to sustain the appellants' convictions within the standards established in *Jackson v. Virginia*, supra, 443 U. S. 307.

2. Jefferson and Edwards contend that the trial court erred by allowing the state to introduce expert opinion testimony, based on the theory of fracture match analysis, that a piece of duct tape found at the scene of the crime came from the roll of duct tape found in Edwards' car. They assert that the state did not demonstrate that fracture match analysis has reached a verifiable state of scientific certainty as required by *Harper*, supra, 249 Ga. 519. As detailed below, we find that the court erred in ruling that the fracture match analysis evidence met the *Harper* standard, but we find that the error was harmless because the majority of the expert's testimony before the jury did not deal with scientific principles and thus was not subject to the *Harper* requirements.

(a) When this court reviews a trial court's ruling on the admissibility of scientific evidence, the applicable standard of review requires that

we construe the evidence most favorably to uphold the findings and judgment, and we adopt the trial court's findings on disputed facts and credibility unless they are clearly erroneous. When the evidence is uncontroverted and

> no question of witness credibility is presented, the trial court's application of the law to undisputed facts is subject to de novo appellate review. With mixed questions of fact and law, the appellate court accepts the trial court's findings on disputed facts and witness credibility unless clearly erroneous, but independently applies the legal principles to the facts.

(Citations and punctuation omitted.) *State v. Tousley*, 271 Ga. App. 874 (611 SE2d 139) (2005). In Georgia, a trial court's findings of fact will not be deemed to be clearly erroneous if there is any evidence to support them. *Roscoe v. State*, 289 Ga. 325, 327 (687 SE2d 455) (2009). Cf. *Anderson v. City of Bessemer City*, 470 U. S. 564, 574 (III) (105 SC 1504, 84 LE2d 518) (1985) (under Federal Rule of Civil Procedure 52 (a), "a finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed") (citation and punctuation omitted).

The trial court ruled that the testimony on fracture match analysis was admissible after determining that fracture match analysis was "based on procedures and techniques that have reached a scientific stage of verifiable certainty." Before scientific evidence can be properly admitted, the proponent of the evidence must lay a proper foundation for its admission. *Tousley*, 271 Ga. App. at 877. The proponent must show "that (1) the general scientific principles and techniques involved are valid and capable of producing reliable results, and (2) the person performing the test substantially performed the scientific procedures in an acceptable manner." (Citations and punctuation omitted.) Id. at 876 (1).

The state, however, failed to demonstrate that the fracture match analysis evidence was founded on valid scientific principles. "[E]vidence based on a scientific principle or technique is admissible only if the science underlying the evidence is a phenomenon that may be verified with such certainty that it is competent evidence in a court of law." *Parker v. State*, 307 Ga. App. 61 (704 SE2d 438) (2010). The state was required to demonstrate to the court that

> the procedure or technique in question has reached a scientific stage of verifiable certainty, or in the words of Professor Irving Younger, whether the procedure "rests upon the laws of nature." The trial court may make this determination from evidence presented to it at trial by the parties; in this regard expert testimony may be of value. Or the trial court may base its determination on exhibits, treatises or the rationale of cases in other jurisdictions. *The*

> *significant point is that the trial court makes this determination based on the evidence available to him rather than by simply calculating the consensus in the scientific community.* Once a procedure has been recognized in a substantial number of courts, a trial judge may judicially notice, without receiving evidence, that the procedure has been established with verifiable certainty, or that it rests upon the laws of nature.

(Citations and punctuation omitted; emphasis supplied.) *Harper*, 249 Ga. at 525-526 (1).

The trial court here did not take judicial notice that fracture match analysis had reached a scientific stage of verifiable certainty, and there was very little evidence available to the court regarding the issue. No evidence of exhibits or treatises was presented to or cited by the court.

Likewise, no rationale of cases from either Georgia or other jurisdictions was presented or cited to the court to show that fracture match analysis satisfied the *Harper* test. The state did not identify at trial any cases in which claims for fracture match analysis were admitted, we have found no Georgia appellate cases admitting such testimony under *Harper*, and the cases identified by the state on appeal do not analyze whether fracture match analysis has reached a scientific stage of verifiable certainty. See *Commonwealth v. Gomes*, 944 NE2d 1007, 1015-1017 (4) (Mass. 2011) (admitting fracture match analysis under general acceptance in the scientific community standard rejected in *Harper*); *State v. Zuniga*, 357 SE2d 898, 911 (III) (N. C. 1987) (admitting fracture match evidence without addressing whether theory of fracture match analysis had reached scientific stage of verifiable certainty); see also *Davis v. State*, 2 S3d 952, 956 (Fla. 2008) (merely mentioning fracture match analysis); *Grim v. State*, 841 S2d 455, 458-459 (Fla. 2003) (same); *State v. Dressner*, 45 S3d 127, 134 (La. 2010) (same); *State v. Smith*, 988 S2d 861, 867 (La. Ct. App. 2008) (same); *Commonwealth v. McCullum*, 602 A2d 313, 315 (Pa. 1992) (same); *State v. Jackson*, 46 P3d 257, 262 (Wash. App. 2002) (same), aff'd, 76 P3d 217 (Wash. 2003). Instead, its expert's testimony was the state's only foundation evidence for fracture match analysis under the *Harper* test.

During voir dire the state's expert witness testified that she is employed as a microanalyst in the Trace Evidence Section of the Georgia Bureau of Investigation's Division of Forensic Sciences, she has a Bachelor of Science degree in chemistry, she completed training in fracture match analysis 11 to 12 years earlier, she has looked at hundreds of fracture matches, and she has testified as an expert 26 times (11 times in Georgia courts) about fracture match analysis.

She testified that, to her knowledge, fracture match analysis evidence has been "accepted" in other cases in Georgia and elsewhere in the United States, but her testimony offered no insight into the rationale employed by any other courts in admitting the evidence. She also testified that, to her knowledge, other crime laboratories used fracture match analysis. But a technique's general acceptance in the scientific community does not satisfy the *Harper* standard for admission. See *Harper*, 249 Ga. at 525-526 (1).

The expert witness's testimony on voir dire may be summarized as follows: fracture match analysis is based on a theory that the molecular structure of material causes the material to display unique fractures when broken; a fracture match is determined by visually comparing two pieces of material; and if the pieces match, then the two pieces originally were part of a single item. The witness opined that a visual examination of fractures could produce definitive results akin to DNA testing.

Specifically, the state's expert testified that as a microanalyst she was typically asked to

> look at items to see if there was a transfer of materials. Usually what [she was] looking for is a transfer [of] paint or plastic. In some instances [she might] be asked to look at broken or fractured materials, things that are either broken, cut, torn, to see if the two of them could have at one time been a single object.

She described the scientific principle behind fracture match analysis as follows:

> On the molecular level the items — materials are — the molecules in a material are arranged randomly. Even if you have a crystalline material, it will be arranged — the crystals within the material will be arranged randomly so that, when you fracture or break or tear apart those items, the fracture or break is going to be . . . random and so that one — there will — it would be a unique fracture. And so the — when you — if you were to effect the same type of break in another material, you're not going to find exactly the same break.

She testified to the procedures she used to analyze the fractures:

> Basically the thing that I would do is I would open up the — the package that it came in. I would look at the material that I'm looking at. In this particular case I was asked to

look at some duct tape. I would first of all want to look at it and make sure that it is the same physical characteristics, that it's the same color, it's the same shape, it's the same size. When you are looking at duct tape, you want to make sure that the backing is the same color along with the same — the adhesive is the same color. You also want to look at things like the scrim fabric to make sure that that's constructed in the same way in both materials. And then you begin to look at the torn ends of the tape to see if there's any — any correspondence between the two tears. Basically what you're looking at is not — you're trying to determine that there is a complex tear or fracture. It's not just totally straight and there's no detail in it. And then you begin to use the stereo microscope to begin to look at things like any markings that may be in the backing of the tape that continue from one side of the tape over — across the fracture line onto the other side of the tape. The — in this instance I also removed some of the adhesive because the scrim fabric — there — there is — oftentimes will be tears and the — the scrim fabric will tear unevenly so that at sometimes some of the yarns will extend out of the — . . . will extend out of the one side and then there will be a blank place in the other — other corresponding spot on the other side. And in this instance there were several of those.

The court asked, "[W]hat is fracture match analysis? What is it? I mean, is it a — a scientific field or is it — I mean, how do you come up with the — ?" The witness responded:

Basically in any analysis that you begin to do whether — whether you're looking at tapes or whether you're looking at paper or plastics, lens pieces or just fabrics, pretty much that is the first step that you do in any analysis. Because if you can perform a fracture match — if you can show that these two items were once one in the same item and that the broken piece was at one time a part of and originated from the whole piece, then that is a definitive comparison. . . . It definitely says that that piece came from the whole.

Asked by the court if fracture match analysis is a subgrouping of microanalysis, she responded in the affirmative and continued:

[I]t really doesn't matter what materials that you are looking at. That would really be your first step is if you can do — if you can perform a fracture match and show that the

piece came from the whole, then that — that says that this piece came from this — this piece came from the whole and no other piece in the world — . . . — came from that. And then that negates the need for doing any chemical analysis or any other type of analysis. And what you're looking for are unique characteristics between the — fractures.

Regarding the analysis she conducted in this case, the witness testified that

[t]he preliminary exam was [her] visual exam to see if [she] could see anything that looked like the two end matches may — may have occurred. In this analysis [she] also looked at other pieces of tape that were also submitted and was able to see that those other ends did not match this particular end. So [she] eliminated those. [She did] not do a detailed comparison of those, just the visual exam.

No chemical or instrumental testing was performed.

Thus, the expert witness's testimony addressed *how* the fracture match analysis was performed. But it did not address the core of the *Harper* test — whether fracture match analysis had reached a scientific stage of verifiable certainty such that the evidence thereof constituted competent evidence. See *Harper*, 249 Ga. at 526 (1); *Parker*, 307 Ga. App. at 61. To this point, the state's expert witness claimed that fracture match analysis was as definitive as DNA testing, because it involved the identification of unique characteristics of the fracture. But when asked for support for her opinion that a visual examination of fractures could produce definitive results akin to DNA testing, the witness testified only that when she performed the analysis her conclusions were peer-reviewed. In contrast, Georgia courts determined that DNA testing had reached a scientific stage of verifiable certainty based upon extensive evidence concerning the scientific theory underlying DNA identification techniques, the protocol and standards with which those techniques were employed, and the statistics and probability by which the reliability of a DNA match could be assessed. See generally *Caldwell v. State*, 260 Ga. 278, 279-287 (1) (393 SE2d 436) (1990). Here, the expert witness's unsupported opinion that fracture match analysis was as definitive as DNA testimony did not establish that the *Harper* standard had been met.

Further, although the state's expert had a Bachelor of Science degree in chemistry and had received training in conducting fracture match analysis, she was not qualified as an expert on the scientific theory underlying the analysis. The state presented no expert

witness who opined that the underlying scientific theory had reached a scientific stage of verifiable certainty.

In summary, no appellate court in Georgia has determined whether fracture match analysis has reached a scientific stage of verifiable certainty so as to become competent evidence under *Harper*. The witness testified on voir dire that fractures are unique and that a match definitively shows that two fractured pieces were once part of the same whole item. Although there might be a means of establishing that this proposition has reached the scientific stage of verifiable certainty required by *Harper*, the state failed to do so in this case.

(b) Nevertheless, the trial court's error in ruling that the *Harper* test had been satisfied does not require reversal. Unlike the expert witness's overreaching testimony on voir dire, her testimony before the jury did not focus on the scientific principles underlying fracture match analysis or its ability to identify unique tears. Instead, the witness testified primarily about her acts of observing and comparing the physical properties of two pieces of duct tape through a stereo microscope. This testimony helped the jury with information the average juror does not have. For example, juries do not have the benefit of a stereo microscope, nor would most think to or have the ability to remove the adhesive over the cloth scrim to better examine the tear in a piece of duct tape.

In *Belton v. State*, 270 Ga. 671 (512 SE2d 614) (1999), the Supreme Court of Georgia held that expert testimony regarding the comparison of shoe prints to the external physical characteristics of particular shoes was not subject to the *Harper* standard, because it did not deal with scientific principle or technique but rather with observation and comparison of physical objects, which were matters of skill and experience. Id. at 674 (4). Consequently, the court in *Belton* held that the expert testimony on shoe prints was admissible although the trial court did not apply the *Harper* test to the evidence. Id.; see also OCGA § 24-9-67 (in criminal cases, opinions of experts on questions of skill shall always be admissible). Like the testimony in *Belton*, most of the testimony given before the jury by the witness in this case was not subject to *Harper* and was admissible as concerning the observation and comparison of physical objects, notwithstanding the trial court's erroneous *Harper* ruling.

The expert witness *did* give some testimony before the jury that should have been excluded under *Harper*. Specifically, she testified that

> at the molecular level the molecules are either arranged randomly or they're arranged in crystals and those crystals are then arranged randomly within the material. So that

when you have a — a tear or a fracture of some sort, then that tear or fracture is going to occur randomly. It's not going to occur the same way in any one material — the exact same way in a material two times.

This information, however, was not a necessary foundation for evidence of the physical comparison performed by the witness, such as her observation that the longer fibers on the end of the duct tape allegedly used to bind one of the victims matched the shorter fibers on the end of the roll of tape found in the car. Moreover, defense counsel elected to expose on cross-examination the expert witness's overreaching regarding the uniqueness of fractures. Defense counsel elicited a repetition before the jury of her claim on voir dire that fracture match analysis is as accurate as a DNA test. Under these circumstances, we find it highly probable that the court's admission of the brief portion of testimony that should have been excluded under *Harper* did not contribute to the judgment in this case. See *Harris v. State*, 283 Ga. App. 374, 379-380 (3) (641 SE2d 619) (2007) (in case of nonconstitutional error, applying highly probable test to determine whether error was harmless).

*Case No. A11A1295*

3. Jefferson further contends the trial court erred by restricting his cross-examination of a police officer. We find no error. During the cross-examination of the officer, Jefferson requested the officer "to come down and examine his arm and tell us what he sees in the way of tattoos." After the state objected, the trial court, relying upon *Wesley v. State*, 228 Ga. App. 342 (491 SE2d 824) (1997), and *State v. Battaglia*, 221 Ga. App. 283 (470 SE2d 755) (1996), sustained the objection because "that deprives the State of the right to — cross-examine the defendant." We find no error. Although Jefferson had a right to a thorough and sifting cross-examination, OCGA § 24-9-64, the right is not unlimited. "[T]he scope of such cross-examination is within the sound discretion of the trial court[ ] [cits.]," *White v. State*, 253 Ga. 106, 110 (4) (317 SE2d 196) (1984), and "[i]t is the duty of the court 'to allow a searching and skillful test of (the witness's) intelligence, memory, accuracy and veracity.'" *Carroll v. Hill*, 80 Ga. App. 576, 581 (56 SE2d 821) (1949). Here, what Jefferson sought was not related to a legitimate purpose of cross-examination, but to introduce evidence without the burden of cross-examination. The trial court did not abuse its discretion.

Overreaching cross-examination may not be used as a vehicle to enable a party to present non-testimonial evi-

dence without being subject to oath, or to subvert the ability of the opposing party to cross-examine the party proponing such non-testimonial evidence. Within carefully protected legal parameters, the scope of cross-examination lies within the sound discretion of the trial court; this discretion will not be disturbed by an appellate court absent manifest abuse. Basically, the confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way and to whatever extent[ ] the defense might wish.

(Citations and punctuation omitted.) *Battaglia*, 221 Ga. App. at 284-285 (1).

4. Jefferson also contends the trial court erred by denying his motion to sever his trial from that of Edwards'. We find no error. A defendant seeking a severance must show clearly that he will be prejudiced by a joint trial and without a showing of clear prejudice, the denial of a severance motion will not be disturbed. *Green v. State*, 274 Ga. 686, 688 (2) (558 SE2d 707) (2002). A trial court should consider the following factors when ruling on a motion to sever: whether a joint trial will create confusion of evidence and law; whether there is a danger that evidence implicating one defendant will be considered against a co-defendant despite limiting instructions; and whether the defendants are asserting antagonistic defenses. *Rhodes v. State*, 279 Ga. 587, 589 (3) (619 SE2d 659) (2005). "The burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing of prejudice and a consequent denial of due process." (Punctuation and footnote omitted.) *Moss v. State*, 275 Ga. 96, 99 (2) (561 SE2d 382) (2002). As Jefferson made no such showing, we find no abuse of discretion in denying the motion to sever.

### Case No. A11A1296

5. Edwards contends that the trial court erred in admitting the expert testimony on fracture match analysis because the witness's conclusion that the pieces of duct tape matched invaded the province of the jury. We disagree.

The issue is not whether the opinion would invade the province of the jury, but whether the subject is a proper one for opinion testimony. Expert opinion testimony on issues to be decided by the jury, even the ultimate issue, is admissible where the conclusion of the expert is one which jurors

would not ordinarily be able to draw for themselves; i.e., the conclusion is beyond the ken of the layman.

(Citations and punctuation omitted.) *Jefferson Pilot Life Ins. Co. v. Clark*, 202 Ga. App. 385, 392 (3) (414 SE2d 521) (1991).

Whether the ends of the two pieces of duct tape matched was a proper subject for opinion testimony. As discussed in Division 2 (b), the witness's opinion on this subject was based on her skill and experience in observing and comparing torn pieces of material, and it rested in part upon her use of equipment and techniques not generally accessible or within the knowledge of jurors. Under these circumstances, we find no abuse of discretion in the court's decision to admit the testimony. See *Jackson v. State*, 291 Ga. App. 287, 288 (2) (b) (661 SE2d 665) (2008).

6. Edwards contends that a witness for the state improperly commented on his rights to remain silent and to counsel, and that the trial court erred in denying his motion for mistrial on this ground. The challenged comment was made by a police officer during the following exchange on cross-examination:

Q: [One of the victims] told you that she saw the heavyset suspect at the mall, didn't she.

. . .

A: Yes sir. She believed that she saw the heavyset suspect at the mall.
Q: And he had a tattoo on his arm saying pray for me?
A: That's correct.
Q: Do you know if my client [Edwards] has a tattoo that says pray for me?
A: Well, I don't know because on December the 20th I went down to the jail and talked to Mr. Edwards but he requested an attorney. I noticed that he did have tattoos . . . but I did not question him about those tattoos because of that fact.

The trial court immediately gave a curative instruction that the jury disregard the witness's statement referring to Edwards requesting an attorney. Edwards' counsel also moved for a mistrial, but the court denied the motion.

A defendant's exercise of his rights to remain silent and to be represented by counsel is not to be used as evidence against him. *Hosch v. State*, 246 Ga. 417, 419 (2) (271 SE2d 817) (1980). But an improper comment on these rights does not necessarily require reversal. See *Whitaker v. State*, 283 Ga. 521, 524 (3) (661 SE2d 557) (2008). "The grant or denial of a mistrial is within the trial court's

sound discretion, and the appellate court will not interfere with the trial court's exercise of that discretion unless it is clear that a mistrial was essential to preserve the right to a fair trial." (Citation and punctuation omitted.) Id.

The Supreme Court of Georgia has held in *Whitaker* that a trial court does not abuse its discretion in denying a motion for mistrial and instead giving a curative instruction where an improper comment on a defendant's exercise of the right to remain silent was not directed to any particular statement or defense offered by the defendant, where the comment instead was made during the witness's explanation of the course of events, and where there was no indication that the comment was intended to, or did, have the effect of being probative on the issue of guilt or innocence. Id. at 524-525 (3). The improper comment in this case was made under similar circumstances as those considered by the Supreme Court. We find no abuse of discretion in the trial court's decision to deny Edwards' motion to dismiss and instead issue a curative instruction.

7. Edwards also contends the trial court erred by denying his motion to suppress the results of the search of his car because "the magistrate [who issued the search warrant] was provided none of the information that might cast doubt on the reliability of the complainants." He contends the affidavit supporting the search warrant application did not reveal that a police officer arriving at the victims' apartment detected the aroma of green marijuana and also did not reveal that the victims in this case had police records. Thus, he asserts that the victims should have been stripped of the presumption of credibility normally afforded law abiding citizens. We find no error.

The standards to be employed when an appellate court reviews a trial court's decision on a motion to suppress are stated in *Tate v. State*, 264 Ga. 53, 54 (1) (440 SE2d 646) (1994).

> In determining whether probable cause supported issuance of a search warrant, a "totality of the circumstances" test is employed. The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for concluding" that probable cause existed.

(Citations and punctuation omitted.) *Sims v. State*, 207 Ga. App. 353, 354 (427 SE2d 842) (1993). Further, a magistrate's decision to issue

a search warrant based on a finding of probable cause is entitled to substantial deference by a reviewing court. *McClain v. State*, 267 Ga. 378, 388 (477 SE2d 814) (1996).

The omissions alleged by Edwards did not require suppression of the evidence seized from his car.

> If a court determines that an affidavit submitted contains material misrepresentations or omissions, the false statements must be deleted, the omitted truthful material must be included, and the affidavit must be reexamined to determine whether probable cause exists to issue a warrant. Even doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper.

(Citations and punctuation omitted.) *Sullivan v. State*, 284 Ga. 358, 361 (2) (667 SE2d 32) (2008). Even if the officer's affidavit had included information about the victims' criminal histories and the marijuana aroma at their apartment, the affidavit also supplied the magistrate with other evidence to support the issuance of the warrant, because it contained information from sources other than the victims from which the magistrate could have found probable cause. It informed the magistrate that another officer learned that the suspects left the apartment area in a yellow Dodge Charger with tinted windows and words similar to "Dakota" on the side; that the previous night another officer had stopped a yellow Dodge Charger with the word "DAYTONA" written on it; and that Jefferson had been allowed to leave with the car after the stop. The trial court's denial of the motion to suppress was not error. See *Sullivan*, supra.

*Judgments affirmed. Phipps, P. J., and Andrews, J., concur.*

DECIDED NOVEMBER 3, 2011 —
RECONSIDERATIONS DENIED NOVEMBER 23, 2011 —

*Jessica I. Benjamin*, for appellant (case no. A11A1295).
*Thomas J. Killeen*, for appellant (case no. A11A1296).
*Kenneth W. Mauldin, District Attorney, Raquel C. Stokes, Jon R. Forwood, Assistant District Attorneys*, for appellee.