**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0403
Travis McFarland
v.
The State

On Appeal from the Superior Court of Troup County
No. 22R0639

Decided: April 21, 2026

ELLINGTON, Justice.

A Troup County jury found Travis McFarland guilty of felony murder and other crimes in connection with the shooting death of James Ponder.[1] McFarland contends the evidence was

---

[1] The crimes occurred on February 9, 2022. On September 7, 2022, a Troup County grand jury indicted McFarland for violating provisions of the Street Gang Act (Counts 1 and 2); felony murder (predicated upon aggravated assault with a deadly weapon) (Count 3); aggravated assault with a deadly weapon (Count 4); felony murder (predicated upon criminal attempt to commit armed robbery) (Count 5); criminal attempt to commit armed robbery (Count 6); and possession of firearm during the commission of a felony (Count 7). After a trial that commenced on September 26, the jury found McFarland guilty on all counts. On October 5, 2022, the trial court sentenced McFarland to serve life in prison for felony murder (Count 3) and merged the conviction for aggravated assault (Count 4) into the Count 3 felony murder conviction, while the remaining felony murder conviction (Count 5) was vacated by operation of law. The court then imposed a 20-year prison term for each violation of the Street Gang Act, with the sentence for Count 1 to run consecutive to his life sentence under Count 3 and his sentence for Count 2 to run consecutive to his sentence for Count 1; a 30-year prison term for his criminal attempt to commit armed

insufficient to support his convictions for violating the Street Gang Terrorism and Prevention Act (the "Street Gang Act"), OCGA § 16-15-1 et seq. He also contends the trial court erred in refusing to give McFarland's requested jury instruction on justification and that his trial counsel provided constitutionally ineffective assistance. As explained below, we discern no reversible error.

Viewed in the light most favorable to the jury's verdicts, the evidence showed the following. On February 9, 2022, Ponder made arrangements through McFarland's cousin to buy a handgun and some marijuana for $250. At around 8:00 p.m., Ponder and his friend, Trevor Sturkie, drove to 909 Troup Street in Troup County to meet the seller. Ponder drove his Honda Civic, and Sturkie sat in the passenger seat. Upon arriving, as Ponder was getting out of his car, Sturkie observed a car slowly passing by them. The passenger in that car was peering at them through his open window. Ponder went to the house at 909 Troup Street, but returned without having completed the transaction.

Two men accompanied Ponder as he returned to his car. As Ponder got in the driver's seat, the two men, one of whom was later identified as McFarland, got in the back. Ponder told Sturkie that he was "going to give [the men] a ride down the street." Sturkie testified that one of the men said: "[H]ey [B]lood, did dude

robbery conviction, to run consecutive to his Street Gang Act sentence under Count 2; and a five-year prison term for the firearm offense, to run consecutive to the criminal attempt offense.  On October 7, 2022, McFarland filed a motion for new trial. New counsel amended the motion for new trial on December 23, 2024. After a hearing held on March 5, 2025, the trial court entered a written order denying the motion on  March 7, 2025. McFarland filed a timely notice of appeal on March 19, 2025. This appeal was docketed to the term beginning in December 2025, and the case was submitted for a decision on the briefs.

get that yet?" Because the two men were giving Ponder directions, Sturkie offered to switch seats with one of them. They declined; one said: "I'm good where I'm at." Then, Sturkie heard someone "racking" a pistol, that is, pulling the pistol's slide to chamber a round. The man sitting behind Ponder said: "[D]ude don't want to sell you his, but I'll sell you mine." After being directed to circle the block, Ponder stopped his car near 909 Troup Street, having returned to where he first stopped. Ponder asked the man in the backseat how much he wanted for his gun and began to take cash from his pocket.

According to Sturkie, when Ponder presented the cash, the men behind him said, "Give it up, give it up." They tried to wrestle Ponder's cash from his hands and began pistol-whipping him with their guns. During the struggle, Sturkie heard two gunshots. Immediately thereafter, the two men fled from the car. Seeing that Ponder had been shot, Sturkie drove him to a nearby hospital. Sturkie testified that he did not see Ponder with a gun that night.

LaGrange Police Department investigators photographed Ponder's car and gathered evidence from it. They observed $280 in cash scattered around the driver's seat. They also saw a .22-caliber pistol in the driver's seat; however, there was no evidence that the pistol had been fired. An unopened pocketknife and other personal belongings were collected from Ponder's body at the hospital. Investigators later recovered two spent shell casings and a cell phone from the back seats. From information stored on the phone, including photographs and social media accounts, investigators determined that the cell phone belonged to McFarland.

Based on information gleaned from McFarland's cell phone, Investigators executed a search warrant at 909 Troup Street the day after the shooting. They seized two .40-caliber

3

handguns—a Smith & Wesson and a Glock—hidden in an abandoned vehicle on the property. A firearms expert determined that the shell casings recovered from Ponder's car and the two bullets removed from Ponder's body during the autopsy had been fired from the Smith & Wesson seized from 909 Troup Street. A fingerprint found on the Smith & Wesson matched McFarland's fingerprints. Photographs and videos from McFarland's phone and social media accounts show him in possession of a .40-caliber Smith & Wesson handgun.

The medical examiner testified that Ponder suffered four gunshot wounds, two to his fingers, one though his back, and one to his thigh. He explained that the four wounds could have been caused by two bullets. He opined that, based on his analysis of the wounds, the weapon was fired from behind and to the right of Ponder's position in the car. The cause of death was attributed to multiple gunshot wounds; the manner of death was ruled a homicide.

Three days after the murder, McFarland spoke with his sister on the phone. The call was recorded. McFarland complained that he did not want to talk about "sad s**t," and told his sister that she "didn't understand." When his sister asked him who had been sitting behind the victim, McFarland said "not me," but he did not deny being in the car. Instead he said that he would not "stack," that is, cooperate with investigators or implicate those involved in the shooting. McFarland evaded arrest until March 1, 2022, when officers with the United States Marshals Service apprehended him in Heard County.

The State presented the testimony of a Lagrange Police Department investigator with expertise in street gangs. He testified to the existence of the Bloods criminal street gang and its affiliates, including the Bell Haven Bounty Hunter Bloods and Young

4

Slime Life ("YSL"); McFarland's association with the gang and its subdivisions; and the nature of the gang's activities as well as the gang's expectations of its members.

The investigator testified that information gleaned from McFarland's social media accounts and text messages revealed indicia of his gang affiliation, including the use of gang language, signs, and statements promoting his participation in gang activities, including burglaries and armed robberies. For example, the State submitted a videorecording of McFarland and others making Bloods' gang signs while at 909 Troup Street. McFarland created gang-related names for his social media accounts, including "YSL Blazer 5," "Slime Fam Hext," and "Slime Hext." Social media messages from the day before the shooting showed McFarland discussing "hitting licks," that is, committing thefts. The expert also testified that "stacking" or "stack nine" was a term used by the Bloods gang that meant "to snitch" or cooperate with a police investigation, which members of the gang are forbidden from doing. The expert also testified that members of McFarland's street gang are expected to have their own weapons, pay dues, contribute to the gang through crimes ("putting in work"), including by "robbing or stealing[, i.e.,] 'sliming' individuals." Further, the gang's primary activities at the time of the shooting included "buying and selling illegal firearms, armed robberies, [and] thefts."

Finally, the expert opined that McFarland's conduct in this case was consistent with participating in the activities of the Bloods criminal street gang, that it would further the interest of the Bloods criminal street gang, and that the conduct would be consistent with a young Bloods member seeking to maintain or increase status among other gang members and thus in the gang

5

because "[a]rmed robberies [are] just one way in which gang members endeavoring to maintain at minimum or increase their status based off expectations and guidelines for the gang[.]"

1. McFarland contends that the evidence was constitutionally insufficient to show that the predicate crimes charged were intended to promote himself within the gang or enhance the gang's reputation. Therefore, he argues, the State failed to prove a nexus between those crimes and gang activity, making the evidence insufficient to support his Street Gang Act convictions. We disagree.

When evaluating challenges to the sufficiency of the evidence to support criminal convictions as a matter of constitutional due process, "we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted." *Boyd v. State*, 306 Ga. 204, 207 (2019) (citing *Jackson v. Virginia*, 443 US 307, 319 (1979)). "We leave to the jury the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences derived from the facts." *Boyd*, 306 Ga. at 207. And the jury decides "whether the defense theory was reasonable and not excluded by the other evidence." *Hamilton v. State,* 309 Ga. 1, 6 (2020) (citation and punctuation omitted).

To carry its burden of proving that McFarland violated the Street Gang Act, the State was required to establish:

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3(3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed

6

any of several enumerated criminal offenses, includ-
ing those "involving violence, possession of a
weapon, or use of a weapon"; and (4) that the crime
was intended to further the interests of the gang.

*Rooks v. State*, 317 Ga. 743, 753 (2023). With respect to the fourth
element, which is the focus of McFarland's claim of error, to prove
"that the commission of the predicate act was intended to further
the interests of the gang," the state must show a nexus between
the predicate act and the defendant's intent to further street gang
activity. See *Butler v. State*, 310 Ga. 892, 897 (2021); *Rodriguez v.
State*, 284 Ga. 803, 807 (2009). The State may meet this proof re-
quirement in several ways, including, among other things, pre-
senting "evidence of a defendant's association with a gang and
participation in its activities before and during the crimes
charged." *Bradford v. State*, ___ Ga. ___(2026), S26A0194, slip op.
at 25 (Ga. Feb. 17, 2026) (2026 Ga. LEXIS 52).

The State charged McFarland with violating the Street
Gang Act in two respects: (a) violating OCGA § 16-15-4(a), while
"being associated with the Bloods, a criminal street gang, [he] did
unlawfully conduct and participate in criminal gang activity
through the commission of the offenses of [the predicate acts
charged];" and (b) violating OCGA § 16-15-4(b) while "being asso-
ciated with the Bloods, a criminal street gang, [he] did commit the
offenses of [the predicate acts charged] … with the intent to main-
tain and increase his status in said gang[.]'

McFarland only challenges the sufficiency of the evidence
as to the fourth element, so we limit our analysis to that element.
See *Blocker v. State*, 316 Ga. 568, 575–76 (2023) (in sufficiency
review, considering only elements of Street Gang Act challenged
by the appellant). Here, the evidence shows that the State carried

its burden of proving that McFarland committed the predicate offenses of felony murder, attempted armed robbery, aggravated assault, and possession of a firearm during the commission of a felony with the intent to further of the gang's interests as well as to maintain or increase his status with the gang. The trial transcript shows that the State qualified a gang expert who testified about the existence of the Bell Haven Bounty Hunters, a subset of the Bloods gang, in Troup County. He testified about the expectations the gang has of their gang members, such as "putting in work"—committing violent crimes, property crimes, and drug deals—to advance within the gang as well as to further the gang's interests. He testified about McFarland's association with the gang, showing that, in McFarland's social media accounts, he identified himself as "Slime Fam Hext" and uses specific Bloods vernacular, such as "slime" and "stack," as well as the gang's gestures and signs. The expert explained that "sliming" or robbing was an expectation within the gang, and that the primary activities of the Bloods and their subsets in Troup County around the time of the shooting involved possessing and selling illegal firearms and committing armed robberies and other thefts. He also noted that "not snitching" was another expectation of the gang, and McFarland explicitly told his sister several days after the murder that he would not "stack," i.e. "snitch." Further, the evidence showed that, shortly before the shooting, McFarland posted a message on social media stating that he was looking for an "easy target," and was interested in "hitting a lick." Finally, when McFarland and his associate were in the back seat of the car behind Ponder, they referred to each other as "[B]lood" shortly before McFarland shot Ponder.

This evidence was sufficient for the jury to find beyond a reasonable doubt that McFarland's crimes revealed an intent to further the interests of the gang and to maintain and increase his

8

status in the gang. See, e.g., *Beamon v. State*, 314 Ga. 798, 803 (2022) (explaining that the jury could infer from the evidence—before, during, and after the crimes—that the crimes were committed with the intent to further the interests of the gang); *Hayes v. State*, 298 Ga. 339, 342–43 (2016) ("Evidence of [a defendant's] association with the [criminal street gang] and his participation in [its] activities before and during the crimes charged [can] provide the required nexus between his criminal acts and the intent to further the gang's interests.").

2. McFarland argues that the trial court committed reversible error by declining to give his requested jury charge on justification, which he argues was his sole theory of defense. We discern no error. Our review of the trial transcript revealed no evidence that would have justified the charge.

> To authorize a jury charge, there must be slight evidence supporting the charge. In determining whether evidence supporting a justification instruction was presented at trial, we can consider only the evidence that the record shows was actually presented to the jury. "A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force[.]" OCGA § 16-3-21(a).

*Williams v. State*, 316 Ga. 304, 311 (2023) (citation omitted).

McFarland asserts that his defense "relied on the physical evidence presented of an unholstered gun found within Ponder's reach, and a knife that fell off of Ponder's person as they pulled

9

him out of the car at the hospital." Although there was some evidence that Ponder had on or near his person a .22 caliber pistol and a pocketknife at the time of the shooting, there was no evidence introduced at trial from which the jury could infer that McFarland would have seen those weapons or that, having known of those weapons' presence, he reasonably believed that Ponder posed an imminent threat to him. The record shows only that Ponder had a closed pocketknife and a firearm somewhere on or near his person at the time of the shooting; it did not show that Ponder ever gave any indication of their imminent use or that he posed an imminent threat. See *Williams*, 316 Ga. at 311.

McFarland did not testify at trial. However, Sturkie testified unequivocally that he did not see Ponder with a gun at any time during the car ride. Further, based on Sturkie's testimony and photographs of the car, the jury could infer that McFarland could not see a weapon on the front seat given that McFarland's view would have been blocked by the driver's seat. Further, he only leaned forward to pistol whip Ponder after Ponder, who was in the front seat, turned toward him and presented cash to pay for the gun. Sturkie also testified that he saw Ponder's hands, which were grasping for his cash as he was being pistol-whipped. Finally, the closed pocketknife was removed from Ponder's person in the hospital. There was no evidence that it was even visible to anyone in the car at the time of the shooting. Based on this evidence, there is nothing from which the jury could infer that McFarland acted in self-defense. Moreover, even were we to assume that McFarland may have seen the .22 pistol, this Court has found that a justification charge was not required where the victim merely possessed a firearm or weapon prior to the shooting. See, e.g., *Williams*, 316 Ga. at 311 (holding that the victim's mere "possession and handling of a gun and bullets near the time that he was shot" was insufficient as slight evidence warranting a self-

10

defense charge); *Hunter v. State*, 281 Ga. 693, 695 (2007) (justification charge not warranted where, although the victim was previously seen with a weapon, there was "no evidence of any threat so as to give rise to a reasonable belief that [the defendant] must shoot [the victim] in the back of the head to avoid death or great bodily injury to himself").

3. McFarland contends that his trial counsel was constitutionally ineffective in three respects. As explained below, the trial court correctly determined that McFarland failed to carry his burden of showing that trial counsel's performance was deficient.

To prevail on his claim of ineffective assistance of counsel, McFarland must show that counsel's performance was constitutionally deficient and that the deficient performance resulted in prejudice to him. See *Strickland v. Washington*, 466 US 668, 687–96 (1984); *Middlebrooks v. State*, 310 Ga. 748, 751 (2021). To satisfy the deficiency prong, McFarland must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (2013). This requires that he overcome the "strong presumption" that trial counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (2015).

> To carry this burden, [McFarland] must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

11

*Vann v. State*, 311 Ga. 301, 303 (2021) (citations omitted). To satisfy the prejudice prong, McFarland must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of his trial would have been different. *Lawrence v. State*, 286 Ga. 533, 533–34 (2010). "If an appellant fails to meet his or her burden of proving either prong of the Strickland test, the reviewing court does not have to examine the other prong." Id.

(a) McFarland argues that his defense counsel was deficient in that he did not object to testimony from the State's gang expert regarding a "highly prejudicial and irrelevant" 2018 murder. McFarland argues that the mention of the 2018 murder "insinuate[d]" to the jury that he was involved in that crime.

The record shows that, when the prosecutor asked the State's gang expert whether he was familiar with the "Slime Fam Hext" social media account found on McFarland's phone, the expert said that he was. Unprompted, the witness added: "And part of my knowledge came from a December 2018 murder investigation that occurred actually on Troup Street." The witness did not testify that McFarland was a suspect in the prior investigation. The prosecutor did not ask any follow-up questions about the prior murder investigation; instead, he asked the witness about the "sorts of things that you have reviewed in preparation for this case[.]" The expert then discussed at length the social media accounts he reviewed in connection with his investigation. At the motion for new trial hearing, defense counsel could not recall why he did not object to the expert's mention of the 2018 murder.

McFarland has not demonstrated with legal argument how the expert's testimony was objectionable. But assuming without deciding that it was objectionable, the failure to object to an iso-

lated, brief, and non-responsive remark that facially did not inculpate McFarland was not objectively unreasonable trial strategy. See *State v. Goff*, 308 Ga. 330, 335–36 (2020) ("Given the fleeting, nonspecific nature of [the allegedly objectionable testimony], we cannot say that trial counsel's assessment was objectively unreasonable."); *Brown v. State*, 307 Ga. 24, 33 (2019) (no deficient performance in counsel's failure to object to investigator's "passing and nonresponsive" reference to the appellant's personal information being used in a jail database); *Kennedy v. State*, 304 Ga. 285, 289 (2018) ("Because the prosecutor's statements, in context, did not constitute a clear propensity argument, Kennedy has not demonstrated that no reasonable attorney would have failed to object to those statements.").

(b) McFarland contends that, when the trial court ruled against defense counsel's request for a justification charge, counsel mistakenly thought that meant he was not allowed to argue justification during closing argument. McFarland argues that his "entire theory of defense was justification and, based on trial counsel's misunderstanding of the law, it was completely abandoned at closing." At the motion for new trial hearing, counsel said he erroneously believed that he could not argue justification in closing based on the court's ruling, but he also agreed that it is usually good trial strategy to base a closing argument on the law that the jury will receive.

Assuming without deciding that trial counsel's decision not to argue justification in closing argument based on a misunderstanding of law constituted deficient performance,[2] McFarland

---

[2] "Unquestionably, the jury is to receive the law from the court, not from counsel. However, counsel have every right to refer to applicable law in

13

has not carried his burden of demonstrating prejudice. To satisfy the prejudice prong, McFarland must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of his trial would have been different. *Lawrence*, 286 Ga. at 533–34. He has not demonstrated that such a reasonable probability exists under the circumstances here. First, there was no evidence submitted from which the jury could reasonably infer that McFarland acted in self-defense. Second, the trial court did not charge the jury on the law of justification. Absent both a jury charge on justification and record evidence to support that defense, it is unlikely the jury would have found a self-defense argument credible, especially considering the strong evidence of McFarland's guilt. Further, in this case, the argument that counsel made was more aligned with the evidence presented. He pointed to weaknesses, inconsistencies, and omissions in the State's case—for example, that Sturkie never identified McFarland—and argued that the evidence did not prove the charges beyond a reasonable doubt. Given these circumstances, trial counsel's closing is not one that would be considered patently unreasonable. It was, in fact, an objectively strategically sound argument. See, e.g., *Blackwell v. State*, 302 Ga. 820, 825 (2018) (finding it is not patently unreasonable for trial counsel to base the defense on the evidence at trial rather than risk losing credibility with the jury); *Smith v. State*, 284 Ga. 599, 602 (2008) ("[C]losing argument is appropriate as long as it is based on evidence that is properly before the jury."). Consequently, having failed to establish the requisite prejudice, this claim of ineffective assistance of

---

argument; it is law that the court will *not* charge the jury that counsel is prohibited from presenting." *Kirkland v. State*, 271 Ga. 217, 219 (2003) (citation omitted; emphasis in original.) Nevertheless, defense counsel has wide latitude to draw deductions from the evidence, even if the deductions are illogical or unreasonable. See *Morgan v. State*, 267 Ga. 203, 203–04 (1996).

counsel fails.

(c) McFarland contends that his defense counsel was deficient for failing to file a demurrer challenging "the flawed indictment." He argues that the indictment did not contain "the essential element of a specified nexus required in the Street Gang Terrorism and Prevention Act." McFarland does not indicate whether counsel should have filed a general or a special demurrer nor does he cite to any statute or caselaw that expressly requires an indictment under the Street Gang Act to specify what evidence constitutes the "nexus."

> A general demurrer challenges the sufficiency of the substance of an indictment. The general demurrer must be granted if the indictment fails to either (1) recite the language of the statute that sets out all the elements of the offense charged or (2) allege the facts necessary to establish a violation of a criminal statute. Put another way, a general demurrer will be granted if the defendant can admit each and every fact alleged in the indictment and still be innocent of any crime. Because granting a general demurrer results in dismissal of the charges, an attorney who fails to file a meritorious general demurrer may be held constitutionally ineffective.

*Moss v. State*, 322 Ga. 757, 765 (2025) (citations and punctuation omitted). Nevertheless, "an indictment couched in the language of the statute alleged to have been violated is not subject to a general demurrer." *State v. Wyatt*, 295 Ga. 257, 260 (2014) (citations and punctuation omitted).

The trial court correctly found that a demurrer to the

15

Street Gang Act counts would have been futile because the indictment tracked the language of the statutes, contained all the elements of the offenses, listed the predicate offenses, alleged the date of the offense and the county where the offense occurred, listed the name of the gang with which McFarland associated and that gang's status as a criminal street gang, the manner in which the crimes were committed, and the identity of the victim. Such allegations provide enough information that the indictment is not susceptible to a general demurrer. As discussed in Division 1, the fourth element of a violation of the Street Gang Act is "that the crime was intended to further the interests of the gang." *Boyd*, 306 Ga. at 209. The existence of a "nexus" between the act and the gang's interest is not a statutory element separate from the fourth element; it is how this Court has characterized the proof necessary to establish that element. This Court determined as a matter of statutory construction that the State was required to prove a nexus with gang interests as a matter of evidentiary proof. See *Rodriguez v. State*, 284 Ga. 803, 805 (2009) (construing OCGA § 16-15-4 in light of the definitions of "criminal gang activity" and "criminal street gang" in OCGA § 16-5-3). See also *McKinney v. State*, 318 Ga. 566, 570 (2024).

Although "[a]n indictment that is not subject to a general demurrer may ... be subject to a special demurrer, which challenges the specificity of the indictment," *Wyatt*, 295 Ga. at 260, the Street Gang Act counts of the indictment were sufficiently specific to survive a special demurrer. See, e.g. *Bullard v. State* 307 Ga. 482, 487 (2019) (upholding specificity of indictment that expressly alleged "the date of the offense, the county where the offense occurred, the gang with which Bullard was associated, that gang's status as a criminal street gang, the predicate act of criminal gang activity, the identity of the victim of that act, and the manner in which that act was done." (citation omitted)).

16

Therefore, because the indictment was not defective, a demurrer would have been meritless, and defense counsel cannot be deficient for failing to file a meritless motion. See *Mims v. State*, 304 Ga. 851, 858 (2019).

(d) Finally, McFarland argues in one sentence that "trial counsel's failure to object to the prejudicial photos was constitutionally deficient, warranting a new trial." There is no citation to the record indicating which of the many photographs admitted at trial were allegedly unduly prejudicial, nor did McFarland offer any legal analysis on this issue. Accordingly, McFarland has failed to carry his burden of demonstrating that his trial counsel was either deficient or that McFarland was prejudiced by any alleged deficiency. See, e.g., *Middlebrooks*, 310 Ga. at 751 (a defendant must overcome the "strong presumption" that trial counsel's performance was adequate); *Bates v. State*, 313 Ga. 57, 69 (2022) (appellant's ineffective assistance claim fails because he did not carry his burden of showing prejudice as a result of trial counsel's alleged failure to object).

*Judgment affirmed. All the Justices concur, except Warren, P.J., not participating.*

17